# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 21-CR-00188-RDM |
| | ) | |
| PAUL ALLARD HODGKINS | ) | |
| | ) | |
| Defendant. | ) | |

## REPLY TO GOVERNMENT OPPOSITION TO THREE MONTHS' EARLY TERMINATION OF SUPERVISED RELEASE

MR. PAUL ALLARD HODGKINS, by and through undersigned counsel, hereby respectfully submits this Reply to the AUSA's (ECF No. 54) and Probation's (ECF No. 55) opposition memorandums to his motion for early termination of supervised release at ECF No. 53, and requests that this Court issue the proposed order at ECF No. 53-2 granting his Motion.

## SUMMARY

Mr. Hodgkins requested a reduction of three months out of his twenty-four month sentence of supervised release. ECF No. 53. He provided the relevant law and standards for the Court's consideration and decision. *Id*. He noted the purposes of supervised release; showed that he is eligible under the law and has the presumption for a decision in his favor; and listed facts showing that he meets all assessment criteria for early termination of supervised release. Because neither the AUSA's emotionally embellished opposition Response (ECF No. 54) regarding Mr. Hodgkins' conduct nor the Probation Services Agency's opposition memorandum (ECF No. 55) addressed the holistic policy and statutory factors, and omitted relevant facts and criteria where they did not overcome the presumption in his favor for early termination of supervised release, this Court should grant Mr. Hodgkins' Motion at ECF No. 53. He poses no threat of recidivism, is no threat to any person or the community, and is a decent, hardworking American who loves his country.

## D.C. PROBATION SERVICES AGENCY (PSA) OPPOSITION IS MISPLACED

The PSA was supposed to have submitted a fact-based assessment about whether supervised release is still needed for post-prison reintegration or any rehabilitation, and whether based on facts Mr. Hodgkins is fully capable of self-direction. The PSA Memorandum did not apply the standards and criteria that the PSA is supposed to use in its advisory assessment role. Because PSA urged this Court to deny termination of supervised release despite Mr. Hodgkins meeting the assessment criteria within the PSA's scope of duties, this Court should grant Mr. Hodgkins' Motion.

The PSA memorandum at ECF No. 55 states that Mr. Hodgkins has been compliant with all conditions of release. The PSA filing stated, "This case meets the criteria for early termination pursuant to 18 USC § 3583(e)(1), as well as the guidelines adopted by the U.S. Probation Office." ECF No. 55 at 1. The unidentified "adopted guidelines" seemingly contradict federal policy. The PSA confirmed that all Mr. Hodgkins' financial obligations were met. *Id*. at 2. Not noted by PSA, Mr. Hodgkins took strides to completely pay his $2000.00 restitution by August 2022.

Despite requirements to use specific assessment criteria, the D.C. PSA excluded field supervisor input and facts when it wrote after its secret discussions with the AUSA: "Our office is opposed to Mr. Hodgkins' request for early termination due to the nature and circumstances of the offense. Based on Mr. Hodgkins' reported compliance, he continues to benefit from the structure of supervision." *Id*. This last statement approaches absurdity. It adheres to no assessment criteria for the PSA, and gives PSA credit for everything that Mr. Hodgkins did on his own. The D.C. PSA creates a new standard, despite all policy and law, that if one complies with conditions then (s)he needs to remain on supervised release. At a minimum, this is a new standard created just for January 6th defendants.

The inference that Mr. Hodgkins is compliant and therefore he receives a benefit from supervision is baseless. There is no benefit to Mr. Hodgkins from continued supervised release as stated in his Motion. There are no programs to which he ever has or could avail himself, nor has PSA ever assisted with his employment. Mr. Hodgkins' successful integration with his community and society was done all on his own because he accepted responsibility and took extra efforts to remain employed and to move forward.

Instead of applying the applicable policy below, the PSA motion refers to an unidentified internal policy where it claims it used: "the guidelines adopted by the U.S. Probation Office." ECF No. 55 at 1. Whatever that adopted policy is, it contradicts the 2018 Guide to Judicial Policy (infra), which does not require PSA to consider the crime of conviction. PSA has a special assessment role, and it failed in its role in this case. With the exception of stating that Mr. Hodgkins has complied with all conditions, the PSA filing did not address the mandatory criteria for PSA and field supervising officers' use in assessing whether to recommend early termination of supervised release – where Mr. Hodgkins has the presumption of early termination of supervised release (listed in his Motion at 6). The previously stated criteria for PSA assessment are:

> (1) The person does not meet the criteria of a career drug offender or career (as described in 28 U.S.C. § 994(h)) or has not committed a sex offense or engaged in terrorism;
> (2) The person presents no identified risk of harm to the public or victim;
> (3) The person is free from any court-reported violations over a 12-month period;
> (4) The person demonstrates the ability to lawfully self-manage beyond the period of supervision;
> (5) The person is in substantial compliance with all conditions of supervision; and
> (6) The person engaged in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision.

2018 Guide to Judiciary Policy, Vol. 8 Part E, Chapter 3, § 360.20(c)(1)-(6), ((Probation and Pretrial Services, (Post-Conviction Supervision))).

By all the above six assessment criteria that PSA should have used, Mr. Hodgkins' gets a green checkmark and his Motion for early termination of supervised release should be granted. PSA should have recommended termination if it had used the six factors specifically assigned for PSA assessment. In the PSA Memorandum's illogic where compliance mandates continued supervision, the PSA stated no fact to support the false claim that Mr. Hodgkins ever received or will receive any continued benefit from supervised release. The only criteria the PSA used to urge this Court to deny Mr. Hodgkins' motion was "seriousness of the offense," which falls under the § 3553(a) factors that are outside the PSA's wheelhouse and judicial policy for PSA assessments. Mysteriously, the PSA mimics the DOJ position when the assessment criteria and facts that it should have used more than indicate the Court should grant Mr. Hodgkins' motion to terminate supervised release.

Even if the PSA legitimately should use such a factor as "seriousness of the crime" in its assessment, it ignored truth in that Mr. Hodgkins is a peaceful member of society. PSA stated nothing that continued supervision is helping or deterring, despite the over the top assertions by the AUSA Response. Then, PSA and used no comparators for "serious crime." If PSA believes its role includes addressing seriousness of the crime, then PSA should have compared Mr. Hodgkins' conduct with that of murderers, arsonists, rapists, other sex offenders, human traffickers, those charged with manslaughter, burglars, robbers, carjackers, drug dealers, and other violent criminals. And then the PSA should have admitted that those in the aforementioned criminal categories have been granted early termination of supervised release upon PSA recommendations in the past. A "years-old" crime is not the single factor to consider, and is not listed in judicial policy as a PSA assessment area. Some officers in the otherwise hard-working D.C. PSA seem to have lost their way. The PSA's recommendation to deny the Motion is irreconcilable with facts and PSA scope.

Furthermore, alerted ahead of the Motion's filing, the D.C. PSA either did not request or intentionally omitted input from the officer who supervised Mr. Hodgkins for twenty-one months. That supervising officer indicated to Mr. Hodgkins that he should submit for early termination, although she could not by D.C. policy officially provide her position on the matter to him or the undersigned. She did indicate in so many words that compared to other felons she supervised, there was nothing further needed for Mr. Hodgkins. The D.C. PSA recommendation is not legitimate without field input, and reflects a bias that will be discussed below.

Using the above assessment criteria, and given that continued supervision serves no justified purpose, the D.C. PSA should have recommended termination of supervised release. Because the PSA did not use the proper criteria to overcome the presumption in Mr. Hodgkins' favor for early termination, and made a legal conclusion without supporting facts, this Court should grant Mr. Hodgkins' motion to terminate supervised release.

## THE D.C. PSA and DOJ SUB-ISSUE

Procedurally, there is an issue involving elements of the PSA that indicates bias against those filing, such as Mr. Hodgkins. Both here and for sentencing and other issues, the AUSAs have created a backroom relationship with some PSA officials that is discriminatory to defendants and subverts the impartiality expected from PSA as a whole. Some officials in the PSA have secret, ex parte correspondences with AUSAs during decision processes that are supposed to be impartial - thus indicating favoritism, deference to, and illegitimate collaboration with AUSAs. This Court should admonish the AUSA and PSA to discontinue ex parte correspondences that are outside the Federal Rules of Criminal Procedure and belie what should be PSA neutrality.

Here, PSA refused to provide Mr. Hodgkins with its position prior to his Motion filing, would discuss nothing, and stated it would only provide the PSA position in "a filing based upon a request

5

from the Court" after Mr. Hodgkins filed his motion. The D.C. PSA slammed the door in Mr. Hodgkins' face where he could not present a position in his Motion. The PSA would not even confirm that it would consider the field supervising officer's position on the matter. This is not a lone case. Many defense attorneys discovered that the DOJ conducted secret communications to influence Presentence Investigation Reports (PSRs), where AUSAs inject ex parte memorandums asserting the DOJ's position into what should be a neutral, impartial PSA process for publication of draft PSRs.[1] The defendants and their attorneys are excluded from these correspondences. Many PSR Officers include what the DOJ wants, without any defendant input to or knowledge of the DOJ's influence writings that add allegations not found at trial or in plea agreement statements of offenses. Final PSRs are published without allowing negotiations among all parties as envisioned in the federal rule timelines. Defendants' objections to final reports are at best in an objection addendum after DOJ input was blindly incorporated. These optics have created the appearance of DOJ interference with the administration of justice, where some actors in the D.C. PSA support the backstage, secret correspondences that cut the defendants out of the process.

Here, the DOJ / AUSA was given deference not afforded to Mr. Hodgkins by PSA prior to the filing of ECF No. 55. Both ECF No. 54 and 55 indicate that both PSA and DOJ secretly agreed that the other was opposing Mr. Hodgkins' motion based on "the crime" from three years ago. ECF 54 at 2 and ECF 55 at 1 show that there was collaboration. The PSA Memorandum tried to excuse the prejudicial collaboration. The PSA stated (in an adulteration of Fed R. Crim. P. 32) that "Pursuant to Rule 32.1(c)(2)(C) of the Federal Rules of Criminal Procedure, the probation office

---

[1] This is confirmed by multiple January 6 defense attorneys regarding the DOJ's continued ex parte correspondences with Probation Services' Presentence Investigation Reports that interfere with impartial, neutral reports; and are outside the rules. The DOJ (ex parte) tells Probation Services what to write in its reports prior to publication of drafts, preventing equal opportunity for both parties to object and comment to a draft. The DOJ might as well write PSRs. This present situation confirms that D.C. PSA appears to maintain with the DOJ a special, deferential relationship. PSA is supposed to be neutral and impartial.

6

advised the United States Attorney's Office of the proposed early termination." ECF 55 at 1. The federal rule says no such thing about the PSA informing the DOJ about the Motion. The reference is gobbledygook. Meanwhile, the AUSA stated that she "consulted" with the PSA. Despite the mismatched stories about who contacted who, the PSA's thinly veiled cover for the ex parte communications with the DOJ by referring to Rule 32.1 is inexplicable and inapplicable. The rule describes requirements for a hearing and has nothing to do with the PSA contacting DOJ.

The undersigned's conversations separately with both the AUSA and PSA advised each of the upcoming Motion. The Motion's publication precluded any reason for the PSA to contact the DOJ ex parte. Further, in a showing of DOJ influence against PSA neutrality, the PSA admits in writing that it was told the DOJ was opposing the Motion. ECF No. 55 at 1. From this collaboration, we know that certain personnel in the PSA continue to give the appearance of working for and favoring the DOJ and its AUSAs. The result as far as PSA goes is that it used incorrect assessment criteria and addressed an area ("nature of the crime") where it showed no facts to reach the legal conclusion that the crime's seriousness and complete compliance with supervision require continued supervision for imaginary benefits to Mr. Hodgkins.

The AUSA confirmed her ex parte communications ("consultation") with the PSA, and then falsely asserted that the PSA was opposing early termination "in light of the seriousness of Hodgkins' offense conduct, Hodgkins' post-sentencing conduct, and his characterization of his criminal conduct in the instant motion." ECF 54 at 2. Despite the AUSA's influence efforts - if not interference - in her *ex parte* "consultation," her misrepresentation about the PSA's filing is of concern considering her near zealotry in everything she claims against Mr. Hodgkins. The PSA memorandum at ECF No. 55 said nothing about any issues with Mr. Hodgkins' conduct or any words. Thus, we have the PSA appearing as a tool of the DOJ rather than a neutral entity for justice.

To send the message that AUSAs need to stop their influence campaigns over willing PSA officials, this Court should admonish both parties and order them to stop the secret ex parte communications and collaborations, and remind the D.C. PSA that it is supposed to be impartial, and not act like a tool of the DOJ. Individual PSA officers and AUSAs cannot be allowed to continue along with what many see as interference with the administration of justice - ironically.

**THE DOJ / AUSA OPPOSITION**

The AUSA's Response at ECF No. 54 has so many issues that it is best to reach the bottom line up front: the Response makes no adequate legal argument with any relevant facts to support denying Mr. Hodgkins' Motion. The Response is an exercise of negative zealotry and ad hominem attacks against a decent human being and American. It misrepresents facts and creates a false narrative. Despite the DOJ inventing narrative out of thin air for many January 6th cases, even where the DOJ fabricates words for CCTV video with no audio, this Response exceeds reality by far. Mr. Hodgkins' Motion shows that he meet all criteria to end supervised release, there is no chance for recidivism, there is no conduct or threat to deter, he is a peaceful man, he has on his own reintegrated in the community and society, he is living lawfully without any assistance by PSA, and there are no programs for or benefits to him by remaining on supervised release. Because the AUSA's Response did not provide facts (truth) in a level, fair assessment to overcome the presumption that Mr. Hodgins should have his supervised release terminated, the Court should grant Mr. Hodgkins' Motion.

Disturbing to rational people is the AUSA's calling the January 6, 2021 Electoral Vote Count at the U.S. Capitol – the ceremony where the Vice President counted the electoral college certificates from states, and nothing was to be "certified" despite the ongoing language abuse propaganda – a "vote count" for the Presidential race in order to mock Mr. Hodgkins' desire to

have time to register to vote. Everyone already knew the states' Electoral College vote counts. January 6, 2021 was pomp and ceremony except for objections. What was interrupted were the objections that were supposed to be accompanied by evidence to support disputed states' certificates being sent back for legislatures to investigate and verify over a ten day period. The law allowed for delays in the final states' electoral certificate counting.

Mr. Hodgkins *did not interfere with voting* so the AUSA's mocking against his requested ability to vote exhibits unnecessary hostility when Mr. Hodgkins needed no excuse to request early termination of his supervised release. Mr. Hodgkins qualifies by any reasonable assessment for grant of his Motion. He mentioned voting because this District and the DOJ have presented and made "democracy" sacred. Democracy begins and ends at the state level in our Constitutional Republic. Mr. Hodgkins never intended to stop democracy, nor could he have done so. Voting had occurred in 2020 in the states. He did not try to steal or damage Electoral College certificates. He walked in and out of the Senate chamber peacefully. Despite the AUSA's embellishment, he did not stop or delay the states' electoral certificate counting ceremony: that had stopped thirty minutes before he walked through the building's open doors and was then pointed by a USCP officer to the Senate chamber entry. Mr. Hodgkins did not delay the restart of the objection debate since he left the building hours before the exit of all other protestors. Granted, he entered the building but the majority of others who peacefully entered and exited the building were not charged with Section 1512. Mr. Hodgkins accepted responsibility for a crime that he did not have the intent to commit because his attorney told him he was automatically guilty because he had entered the Senate chamber. He pled guilty after arguing that he had not acted like a felon, but his attorney falsely said all charges against him were felonies. The AUSA backed up the former attorney and

misrepresented to the Court and Mr. Hodgkins at his plea hearing on June 2, 2021 that all charges against him were felonies. See Plea Hearing Transcript:

> MS. SEDKY: Thank you, your Honor. So the original five counts included the count one to which the defendant is pleading guilty, which is 18 U.S.C. 1512(c)(2). And there were four felonies that were also charged that will be dismissed at the time of the indictment pursuant -- I mean, at the time of sentencing pursuant to the plea agreement. And those include 18 U.S.C. 1752(a)(1), which is entering and remaining in a restricted building or grounds; 18 U.S.C. 1752(a)(2), which is disorderly and disruptive conduct in a restricted building or grounds; 40 U.S.C. 5104(e)(2)(D) which is disorderly conduct in a Capitol building; and lastly, count five is 40 U.S.C. 5104(e)(2)(G) . . . .

ECF No. 41 Plea hearing Transcript, at 4:14-25.

But the AUSA has now said out loud here what many Americans already believe: the DOJ intends to disenfranchise as many conservatives from voting as it can and to continue intimidation by arresting people who had no knowledge of any restricted grounds under 18 USC Section 1752. It is indeed a sad day in America when a DOJ AUSA mocks and works in overdrive to prevent an American from voting.

In a dramatic continuation of hyperbole, the Response states, "Hodgkins engaged in extremely serious offense conduct—purposefully obstructing the peaceful transition of power on January 6." (ECF No. 54 at 1). This is a sad reflection of lack of Constitutional knowledge in the DOJ where the Response replicate's the legacy news media disinformation propaganda. There is not and cannot be any transfer of power on January 6, 2021. The Constitution sets inauguration of the President of the United States (POTUS) at noon on January 20th (or January 21st if the 20th falls on a Sunday). The transfer of power is when the new President is inaugurated upon taking the oath of office. President Trump was still POTUS after January 6, 2021, and remained so until noon on inauguration day.

In further unfair hyperbole, the Response claims that "Hodgkins, through his continued failure to accept responsibility for his serious crimes, has demonstrated a heightened risk of recidivism and, in turn, the need for continued, not shortened, supervised release." ECF No. 54 at 2. It is completely false that Mr. Hodgkins failed to accept responsibility for his conduct. In fact, he took responsibility for a crime he was told he was strictly liable for when that was false. There is no chance of recidivism. Is the AUSA asserting that between the present and when supervised release ends in April 2024 that Mr. Hodgkins is going to travel to D.C., enter the U.S. Capitol, and then protest? That is not going to happen. However, the allegation is curious since of hundreds of Hamas demonstrators who demonstrated in the Congressional office buildings and disrupted government business, and a Congressman who deliberately pulled a fire alarm to stop Congressional proceedings, none have been charged by the DOJ with 18 U.S.C. Section 1512.

The DOJ never bypasses an opportunity to restate the lines that are in every charging document, plea agreement statement of facts, motion response, pretrial statement, and any other document. The "attack on the Capitol" did not involve Mr. Hodgkins, where the government included its narrative in his statement of the offense. This narrative is mandatory and the government will never allow a change. Mr. Hodgkins entered open grounds with no warning or notice there was a Section 1752 Restricted Area. The AUSA's claims that he saw violence between protestors and police and that he smelled gas are pure fabrications. They are not necessary. They serve as a false ad hominem attack on Mr. Hodgkins. It is worth noting here that Mr. Hodgkins former attorney never showed him the Statement of the Offense before the Plea Hearing. he never gave Mr. Hodgkins a copy of the Statement of the Offense, as was shown by review of Mr. Hodgkins' personal case file of documents. Mr. Hodgkins' signature page was due to his former

attorney giving him just the signature page and saying the signature was required for the plea agreement.

The Response approaches tyranny in alleging that Mr. Hodgkins' consideration of filing an appeal constitutes misconduct and failure to assume responsibility. ECF No. 54 at 4. There is a serious problem in the DOJ when these type assertions are made. Mr. Hodgkins was ineffectively assisted by former counsel, lied to, and had his signature forged by said counsel - among many other things. The AUSA was in receipt of an email from former counsel where he told her to create a plea for the single felony. He was in a rush because he had a military deployment he never previously told Mr. Hodgkins about when taking the case. the AUSA was also in receipt of an email where the former attorney told her to use an illegitimate signature page for Mr. Hodgkins' protective order. She instead filed a blank signature page and neither she nor the former attorney ever provided any discovery to Mr. Hodgkins, with the exception of three public video clips. She did not advise the Court of this apparent unethical behavior. She did not advise the Court that Mr. Hodgkins' former attorney wrote her to send the plea deal and he would have it signed by Mr. Hodgkins in thirty minutes.

Incredibly, the Response states that "Hodgkins separately made wholly unsubstantiated challenges to the authenticity and validity of his signature." ECF No. 54 at 4. The forgery by Mr. Hodgkins' former attorney for the plea agreement signature has been verified further than the document examiner's clear evidence showing forgery. We still do not know what document Mr. Hodgkins' signed on Memorial Day, 2021. He did sign a plea agreement.

The response regurgitates an irrelevant encounter where a felon took a picture with Mr. Hodgkins. The man is obscure. *Id*. at 4-5. Normal Americans do not walk around googling

attendees at events, despite the DOJ expectation. Americans do not possess the DOJ mass surveillance software.

The AUSA's legal argument, if it can be called that, is weak and does not address all relevant facts and criteria. The requirement is to look at the present, while the AUSA is living in the past and using embellishments. The AUSA refuses to acknowledge the purpose of supervised release or give credit where credit is due. And she now equates consideration of an appeal as criminal and a violation of some sort. Legal processes are no longer allowed under this AUSA. God help America.

## CONCLUSION

Because neither the AUSA nor the PSA made a relevant argument under all criteria to be considered, and did not overcome the truth and the presumption in his favor for termination of supervised release after serving more than 18 months, Mr. Hodgkins should have his supervised release ended three months early on January 13, 2024.

**WHEREFORE**, PAUL ALLARD HODGKINS respectfully requests that the Court grant his Motion at ECF No. 53 and issue the proposed order at ECF No. 53-2. This Court should also admonish both parties and order them to stop the secret ex parte communications and collaborations, and remind the D.C. PSA that it is supposed to be impartial, and not act like a tool of the DOJ.

January 8, 2024                             Respectfully submitted,
                                            /s/ *Carolyn A. Stewart*

                                            Carolyn A. Stewart,
                                            Defense Attorney  D.D.C. Bar No. FL0098
                                            Stewart Country Law PA
                                            1204 Swilley Rd.
                                            Plant City, FL 33567
                                            Tel: (813) 659-5178
                                            Email: Carolstewart_esq@protonmail.com


## CERTIFICATE OF SERVICE

I hereby certify on the 8th day of January 2024, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

                                            /s/ Carolyn Stewart
                                            Carolyn Stewart, Esq.